IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER J. KOST, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-2404 |
| | : | |
| v. | : | |
| | : | |
| DEP'T OF PUBLIC WELFARE, | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| *ESTELLE B. RICHMAN, Sec'y,* | : | |
| *in her official capacity*, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**Jones, II, J.**                                      **December 15, 2011**

Presently before the Court is the summary judgment motion of Defendants Estelle B.

Richman, Denise White and Sandy Brooks of the Department of Public Welfare, Commonwealth

of Pennsylvania ("DPW").  (Dkt. No. 40.)  For the reasons set forth below, Defendants' Motion

will be DENIED in part and GRANTED in part.

## I.    PROCEDURAL BACKGROUND

Plaintiff Peter J. Kost timely filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission

("PHRC"); he received right-to-sue letters from the EEOC and the PHRC in March 2007.  On

June 14, 2007, Mr. Kost filed his original Complaint against in Ms. Richman in her official

capacity as Secretary of DPW.  (Dkt. No. 1.)  On September 24, 2007, he filed an Amended

Complaint (Dkt. No. 4), and on May 6, 2008, he amended his Complaint again, adding Denise

White and Sandy Brooks as Defendants.  (Dkt. No. 9).[1]

Currently pending before this Court is Mr. Kost's Third Amended Complaint, filed on March 11, 2009.  (Dkt. No. 22.)[2]  In his Third Amended Complaint, Mr. Kost asserts that DPW discriminated against him on the basis of his race, and that Defendants Brooks and White conspired to deprive him of his constitutional rights.  Mr. Kost brings a claim pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, against DPW (Count I); he also brings a claim pursuant to 42 U.S.C. § 1983 against Defendants Brooks and White (Count II).  On March 31, 2009, Defendants filed their Answer and Affirmative Defenses to the Third Amended Complaint.  (Dkt. No. 23.)

On January 15, 2010, Defendants filed their Motion for Summary Judgment ("MSJ"), along with their Memorandum of Law in Support of their Motion and Statement of Undisputed Facts ("Defs. SOF"). (Dkt. No. 40, collectively.)  Mr. Kost filed his opposition ("Pl. Opp."), including his Memorandum of Law in Opposition to Defendants' Motion ("Pl. Mem.") and his own Statement of Undisputed Facts (Dkt. No. 44, collectively), as well as his response to Defendants' Statement of Undisputed Facts ("Pl. Opp. to Def. SOF") (Dkt. No. 45), on February 19, 2010.[3]  With the Court's permission, Defendants filed a reply brief on March 2, 2010 ("Defs.

---

[1]Ms. Richman has been named in her official capacity as Secretary of DPW; Ms. White and Ms. Brooks have been named in their individual capacities.

[2]While originally before the Honorable Cynthia M. Rufe, this case was ultimately reassigned to my docket on November 17, 2008.  (Dkt. No. 15.)

[3]In his opposition, Mr. Kost objects to Defendants' use of declarations by Mr. Robert Stoffa and Mr. Keith Burns in their summary judgment motion.  (Pl. Mem. at 3.)  As the Court does not rely on these declarations in reaching the conclusions set forth herein, it need not address any related alleged discovery violations; indeed, Mr. Kost did not file any formal motion raising any such issue.

Reply") and Mr. Kost filed a supplemental response on June 29, 2010.  (Dkt. Nos. 49 and 54, respectively.)

## II.     FACTUAL ALLEGATIONS

On April 18, 2005, Mr. Kost began working as an Income Maintenance Caseworker (IMCW) trainee at the Norristown County Assistance Office of the DPW.  (Ex. 1 to MSJ, (Deposition of Plaintiff Peter J. Kost, dated August 20, 2009 ("Kost Dep.")) at 42-44.)   Mr. Kost was accorded probationary status as an IMCW trainee.  (Ex. 3 to MSJ (Deposition of Defendant Sandy Brooks, dated August 6, 2009 ("Brooks Dep.")) at 27.)  This probationary period ordinarily lasts six months, after which trainees receive an Employee Performance Review ("EPR") and are either granted permanent status or have probation extended for another six months, with a second EPR after 60 days.  (Brooks Dep. at 27.)  If trainees fail to receive a satisfactory rating by the end of the extension period, they are dismissed.  (Ex. 2 to MSJ (Deposition of Defendant Denise White, dated August 6, 2009 ("White Dep.")) at 80-81.)

From the beginning, the record reveals very different accounts of Mr. Kost's relationships with his colleagues.  Mr. Kost's first training supervisor was Ms. Donna McMahon, a white female.  (Kost Dep. at 63-64.)  According to Ms. McMahon, Mr. Kost became upset and argumentative in response to criticism, often raising his voice when Ms. McMahon returned his work for corrections.  (Ex. 8 to MSJ (Declaration of Donna McMahon ("McMahon Decl.") ¶ 6; Ex. 11 to MSJ (Declaration of Michael Branca ("Branca Decl.") ¶ 6.)  For example, Mr. Kost allegedly grew argumentative when he and Ms. McMahon had a disagreement over whether he would use a pen or pencil in completing his paperwork.  (McMahon Decl. ¶¶ 9, 14.)  Ms. McMahon claims she held a corrective conference with Mr. Kost to address his inappropriate

behavior in response to her instructions on how to prepare a case record.  (Att. A to McMahon

Decl. ¶ 10 ("July 2005 McMahon Memo").)  Another corrective conference allegedly was held in

response to Mr. Kost waving a case and loudly saying, "Look at this, why couldn't she tell me

this the first time, why does this case keep going back and forth."  (McMahon Decl. ¶ 11; Branca

Decl. ¶ 6.)  In Defendants' version of the facts, Mr. Kost sometimes yelled so loudly during

conferences with Ms. McMahon that Ms. Jenifer Burton and Mr. Michael Branca, members of

Mr. Kost's training class, could hear him through a closed door.  (Ex. 12 to MSJ (Declaration of

Jennifer Burton-Branca ("Burton Decl.") ¶ 8; Branca Decl. ¶ 7.)[4]

       In contrast, Mr. Kost considered his relationship with Ms. McMahon "good, but at times,

. . . troubling, too."  (Kost Dep. at 67.)   He insists that he viewed criticism as a learning

experience, was never bothered by criticism, and never raised his voice to Ms. McMahon.  (Kost

Dep. at 69, 129; Declaration of Peter J. Kost, Ex. 2 to Pl. Opp. ("Kost Decl.") ¶ 23.)   Though he

concedes that there was a disagreement over whether he would use pen or pencil in completing

assignments, he denies ever becoming argumentative and contends that Ms. McMahon had given

him conflicting instructions.  (Kost Dep. at 67-68; Pl. Opp. to Defs. SOF ¶¶ 42-43; Ex. 17 to Pl.

Opp. to Defs. MSJ (Trainer Review of Data Entry).)  Mr. Kost denies that he and Ms. McMahon

ever met in a corrective conference.  (Pl. Opp. to Defs. SOF ¶¶ 48-50; Kost Dep. at 73-74.)  He

also denies that he ever raised his voice loudly enough that Ms. Branca could hear it.  (Kost Decl.

¶ 3.)  Mr. Kost points to other allegedly discriminatory comments that Ms. Burton made to Mr.

---

[4]Ms. Burton married co-worker Michael Branca; in the record, she is variously referred to
as Ms. Burton, Ms. Burton-Branca, and Ms. Branca.  Her first name is also misspelled several
times as "Jennifer," instead of Jenifer.  The Court shall herein refer to her as Ms. Burton.

Kost, implying that Ms. Burton's observations should not be believed.  (Pl. Opp. to Def. SOF ¶ 51.)

In September 2005, Ms. McMahon was promoted, and Mr. Kost was assigned to a new training supervisor, Ms. Sandy Brooks.  (Kost Dep. at 66-67; McMahon Decl. ¶ 3).  Ms. Brooks is an African-American female.  (Defs. SOF ¶ 53.)  At the time, Ms. Brooks was supervising Ms. Jewel Moseley, Ms. Burton, and Ms. Abimbola Opaleye-Oluwo.  (Kost Dep. at 106-07.)  All of them are African-American females as well.  (*Id.*)  Later, Mr. Joseph Magee–a white male–was added to the group.  (Kost Dep. at 94, 107-08; Brooks Decl. ¶ 20).

Mr. Kost's relationship with Ms. Brooks initially was "positive."  (Kost Dep. at 70.)  In an email to Mr. Kost, Ms. Brooks remarked, "You were not expected to know everything to do on the cases, but you are expected to learn from mistakes made and not make the same mistakes in the future.  I feel confident that you are doing so."  (Ex. 27 to Pl. Opp. to Defs. MSJ (Brooks Email to Kost dated October 20, 2005); Ex. A, Brooks Decl. ¶ 10.)  According to Mr. Kost, however, Ms. Brooks' attitude toward him changed after his six-month EPR.  (Ex. 14 to MSJ ("October 2005 EPR"); Pl. Opp. to Defs. SOF ¶ 59; Kost Dep. at 81.)  That EPR was completed by Ms. McMahon and Ms. Brooks, and it was approved by Ms. Denise White, an African-American female, who supervised training supervisors, including Ms. McMahon and Ms. Brooks.  (McMahon Decl. ¶ 14; Brooks Dep. at 34, 52; Defs. SOF ¶ 21; White Dep. at 21, 68-69.)  Because Mr. Kost received an "Overall Rating" of "Needs Improvement," his probationary status was extended, and he would receive another EPR in 60 days.  (McMahon Decl. ¶ 14.)  Mr. Kost also was rated as "Needs Improvement" in the EPR's "Communications" category, with related comments noting disagreements between Ms. McMahon and Mr. Kost,

5

along with the comment, "You often had difficulty following instructions and were often argumentative with your supervisor."  (McMahon Decl. ¶¶ 11-14.)

Mr. Kost believes that the bad review was part of a plan to set him up for termination on the basis of race.  (Pl. Opp. to Defs. SOF ¶ 66.)  According to Mr. Kost, he overheard Ms. White yell into the telephone:

> I hate the fact that these people are veterans because they have preference. They're–majority of them are white, and they never work out, and I have to get rid of them. . . . I'm going to offer them that if they resign, they could get unemployment, and that way, they'll have a clear name and nothing negative would happen.

(Kost Dep. at 51.)  Mr. Kost relayed what he heard to Mr. Jim Burne and Mr. Ed LeSage–both of whom were white military veterans, like him.  (Kost Dep. at 51-52.)  Mr. Burne initially had received a "positive" review after his three month in-class training, and then later had received a "vicious" review from Ms. Brooks and Ms. White.  (Ex. 10 to Pl. Opp. to Defs. MSJ (Testimony of Jim Burne before Civil Service Comm'n at 94).)  According to Mr. Burne, not "as much time was spent with [white males], as far as on the job training after the training class ended.  I don't think there was interest."  (*Id*. at 98.)  Mr. Cornelius Leone, a white male clerk supervised by Ms. White, also testified that "non-white co-workers, non-white peers, were given more benefit of the doubt, as far as making mistakes, as opposed to the Caucasian clerks."  (Ex. 11 to Pl. Opp. to MSJ, Testimony of Cornelius Leone before Civil Service Comm'n at 75.)

Mr. Kost did not sign the EPR because, in his view, it contained a number of incorrect statements.  (Kost Dep. at 74.)  He requested and was granted a meeting with Ms. White, Ms. Brooks, and Mr. Kost's union representative Ed Woltermate, a white male.  (Kost Dep. at 80-81, 130; White Dep. at 71.)  Mr. Kost contends that he tried to explain to Ms. White that he had

never been disruptive, but she responded that "this is the way it's going to be . . . I'm not going to change it."  (Kost Dep. at 77.)  According to Mr. Kost, he expressed to Ms. White that DPW was discriminating against him because he was a white male, pointing to Mr. Burne and Mr. LeSage's failure to achieve permanent status and to Ms. White's alleged statement about disliking white veterans.  (Kost Dep. at 77-79.)  In response, Ms. White allegedly yelled at him, calling him an "absolute goddamn liar."  (Kost Dep. at 79.)  Before leaving the meeting, Mr. Kost vowed that "the truth will come out someday, even if it takes me the rest of my life."  (Kost Dep. at 77, 81.) Mr. Kost remained on probationary status.  Ms. Moseley and Ms. Burton received permanent employment status.  (Kost Dep. at 108.)

According to Mr. Kost, Ms. Brooks became "very bossy" after the October 2005 EPR. (Kost Dep. at 94.)  According to Ms. Brooks, Mr. Kost became more difficult to supervise. (Brooks Dep. at 53.)  What is clear is that Ms. Brooks met with Mr. Kost several times to discuss errors and provide suggestions for the future.  (Pl. Opp. to Defs. SOF ¶¶ 78-81; Defs. SOF ¶¶ 78-81.)  Ms. Brooks contends that Mr. Kost would engage in lengthy discussions of disputed issues, while Mr. Kost insists that he merely "did as he was instructed" and occasionally sought advice from other supervisors. (Brooks Decl. ¶¶ 17-18; Pl. Opp. to Defs. SOF ¶ 78; Kost Dep. at 104-05.)

Mr. Kost contends that Ms. Brooks gave greater instruction to the African-American employees than to him and the other white males in the office.  (Kost Dep. at 77; Kost Decl. ¶¶ 32-35.)  He believed that his work was scrutinized more closely by Ms. Brooks, even though he was performing his job better than Ms. Moseley and Ms. Burton.  (Kost Dep. at 99-101.)  Mr. Kost notes that at one point, Ms. Moseley said to him, "Look at the situation here . . . I'm black.

My supervisor's black.  And her supervisor is . . . Hey, well, you're outnumbered."  (Kost Dep. at 59.)  In Mr. Kost's version of events, at some point, he told Ms. Brooks that his less favorable treatment was the result of "discrimination."  (Kost Dep. at 95.)  Ms. Brooks responded by asking him if he was "calling [her] a racist" and by pointing to her bi-racial parents.  (*Id.*).  Ms. Brooks denies that this conversation took place.  (Defs. SOF ¶ 87 n.3.)

Mr. Kost went on sick leave for two weeks in mid-November 2005.  (Kost Dep. at 112.)  When he returned, he began to ask for his 60-day EPR.  (Kost Dep. at 112-13.)  Ms. Brooks told him that the EPR would be delayed because of his absence.  (Kost Dep. at 114.)

On December 22, 2005, Mr. Kost reported what was, in his view, a discriminatory conversation that he had had with Ms. Moseley.  (Kost Dep. at 114-17.)  According to Mr. Kost, Ms. Moseley had stated that he "would look good as a woman" and "should consider getting a sex change."  (Ex. 28 to Pl. Opp. to MSJ, Kost Speed Message re: Moseley.)  Mr. Kost believed that he had been subjected to sexual harassment and requested a formal apology and a seat change.  (Kost Dep. at 121.)  Ms. Brooks responded by speaking with the other trainees about the incident.  (Brooks Dep. at 64.)  She instructed them to provide handwritten statements on Speed Message Forms.  (*Id.*)  Ms. Opaleye-Oluwo and Mr. Magee did not recall hearing the conversation, while Ms. Burton wrote that Mr. Kost had complained about being discriminated against because he was a white male in the military. (Ex. 29 to Pl. Opp. to MSJ, Burton Speed Message.)  Ms. Brooks sent the Speed Messages to Ms. White.  (Brooks Dep. at 36-37.)  Mr. Kost's seat eventually was changed, and Ms. Moseley and Ms. Burton were told to stop their "chit-chat."  (Kost Dep. at 117-20; Brooks Decl. ¶¶ 7-9.)  No other disciplinary action was taken.

On January 4, 2006, Mr. Kost requested a discrimination complaint form from Ms. Brooks.  (Ex. 30 to Pl. Opp. to MSJ, Brooks Email dated January 4, 2006 ("1/4/06 Brooks Email").)  The same day, Ms. Brooks emailed herself a statement which she characterizes as "summarizing her problems with supervising [Mr. Kost] and the basis for her safety concerns," which she forwarded to Ms. White.  (Defs. SOF § 111; Brooks Decl. ¶ 13.)  In the email, Ms. Brooks wrote that Mr. Kost "feels he has to challenge every direction given," "often makes simple diretions [sic] given to him a big ordeal," "raises his voice and demands action," and "often mixes up conversations."  (1/4/06 Brooks Email.)  In addition, she wrote, "I sometimes feel that when I am giving direction, I need someone there because the information I give him is always brought back to me, by him, totally backwards." (*Id.*)  Finally, she wrote, "I felt on several occasions that [Mr. Kost] could become upset enough to cause me physical harm," and that "[h]is body language dictates that he is on the verge of breaking and it is not smart to be in a closed environment with him."  (*Id.*)  Mr. Kost denies that he ever caused such a reaction.  (Pl. Opp. to Defs. SOF ¶¶ 112-16.)  On that same day, Ms. White reported Mr. Kost's intent to file sexual harassment charges to the Director of Human Resources, Ms. Maryann DeFranco, Ms. McMahon's sister.  (Ex. 15 to Defs. MSJ, White Email to DeFranco dated January 4, 2006 ("1/4/06 White Email").)

On January 12, 2006, Ms. Linda Fuller, a white female trainee, sent Ms. White an email describing an incident wherein Mr. Kost was upset and declared that if he were fired, everyone in the office would be sorry.  (White Decl. § 2.)  Ms. Fuller said that "his tone scared me to the point that I remember it today."  (*Id.*)  Mr. Kost denies that the incident in the email occurred. (Pl. Opp. to Defs. SOF ¶¶ 120-22.)

At some point in January 2006, Mr. Kost informed Ms. White that he wanted to lodge a complaint with the Equal Employment Opportunity Commission ("EEOC").  (White Dep. at 101-02.)  According to Ms. White, she provided Mr. Kost with the necessary paperwork.  Mr. Kost, however, contends that he requested the paperwork from Ms. Joan Fulton, Ms. Brooks' new supervisor, because he believed that Ms. White would not address his concerns.  (Pl. Opp. to Defs. SOF ¶ 126.)  Neither Ms. White nor Ms. Brooks spoke with Human Resources about Mr. Kost's allegations.  (White Dep. at 98; Ex. 34 to Pl. Opp. to MSJ, Deposition of Maryann DeFranco, dated September 18, 2009 ("DeFranco Dep.") at 23, 80.)  Mr. Kost did not submit a formal discrimination complaint to Ms. White or to any other DPW official while employed by DPW.  (White Dep. at 103.)

On January 24, 2006, Mr. Kost received his 60-day EPR, which was completed by Ms. Brooks and approved by Ms. White (Ex. 14 to MSJ ("January 2006 EPR"); Brooks Dep. at 29-30.)  Under "Communications," the EPR stated, "You fail to communicate effectively with your supervisor;" under "Interpersonal Relations/Equal Employment Opportunity," the EPR stated, "You have had a very tumultuous relationship with your coworkers and supervisor."  (Ex. 36 to Pl. Opp. to MSJ, Kost January 2006 Evaluation.)  It did not reference any discrimination complaints.  (*Id.*)  The comments section for "Overall Rating" stated "Your performance as an [IMCW] has been rated unsatisfactory during this extension of your probationary period as reflected by this [EPR] and does not merit granting you permanent status in this classification."  (*Id.*)  At this point, it became clear that Mr. Kost would not be granted permanent employment status.  (Kost Dep. at 132.)

After learning of his upcoming termination, Mr. Kost took sick leave for a month.  (Kost Dep. at 133.)  According to Ms. DeFranco, Mr. Kost called her when he was on leave and requested information on filing a discrimination complaint.  (DeFranco Dep. at 46-47.)  She asserts that she sent him documentation on how to file complaints with the EEOC and Pennsylvania Human Relations Commission ("PHRC").  (*Id.*)  Mr. Kost denies that Ms. DeFranco sent such instructions to his correct address.  (Pl. Opp. to Defs. SOF ¶ 141.)

When Mr. Kost returned to the office on February 21, 2006, a conference regarding his EPR was scheduled for that afternoon.  (Kost Dep. at 134-35.)  Mr. Kost, Mr. Woltermate, Ms. White, and Ms. Brooks were at the conference.  (White Dep. at 104.)  Mr. Kost asked to speak with Ms. Fulton, told her that he wished to rebut the EPR, and requested an additional day to present his evidence.  (Kost Dep. at 136-38.)  The conference was continued until the next day.  (*Id.*)  When the conference resumed, Mr. Kost submitted a written statement, which stated that Ms. Brooks had "made statements that are false, with the intention of destroying my reputation as a caseworker and as a human being.  These false statements have caused me much anguish, so much so that I have become ill.  I wish for this harassment to stop."  (Ex. D-15 to Kost Dep., Commonwealth Employee Witness Statement.)  At the conclusion of the meeting, Ms. White submitted paperwork to the Human Resources Department recommending that Mr. Kost's employment as an IMCW be terminated because of his unwillingness to be supervised.  (White Dep. at 116-17.)  The Human Resources Department forwarded the information to DPW headquarters in Harrisburg, where the decision to terminate Mr. Kost was made within 24 hours, despite the fact that such decisions normally take about a week.  (White Dep. at 83-86.)

On February 22, 2006, Mr. Kost received a letter from Ms. Fulton, notifying him that he was being terminated for unsatisfactory performance (Ex. 14 to MSJ, "Termination Letter"). (Kost Dep. at 138-39; White Dep. at 86.)  Mr. Kost asked to speak with Ms. Fulton and told her that he had been subjected to discrimination.  (Kost Dep. at 136-37.)  She declined to intervene and urged him to use his various appellate options if there was a problem.  (*Id.*)

After Mr. Kost's termination, the Pennsylvania Unemployment Compensation Board of Review conducted a hearing regarding his eligibility for employment compensation.  (Kost Dep. at 143-44.)  It held that he was ineligible for benefits.  (Ex. 7 to Defs. MSJ, Declaration of Maryann DeFranco ¶ 19).  Mr. Kost appealed his termination to the State Civil Service Commission ("SCSC").  (Kost Dep. at 148-49.)  The SCSC ruled against Mr. Kost.  (Kost Dep. at 149-51.)  Finally, Mr. Kost lodged a complaint with the PHRC, which dismissed his complaint for lack of probable cause.  (Ex. 13 to Defs. MSJ, Declaration of James Marshall ¶ 2.)

## III.    <u>LEGAL STANDARD</u>

Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To defeat a summary judgment motion, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.  An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue.  *Anderson*, 477 U.S. at 248.

"In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant.  The employer must persuade [the court] that, even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor."  *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008) (citations omitted).  The court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion."  *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## IV.   DISCUSSION

### A.   TITLE VII CLAIM

Under Title VII of the Civil Rights Act, it is "unlawful . . . for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e2(a)(1).  In 1991, Congress clarified that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, *even though other factors also motivated the practice*." 42 U.S.C. § 2000e-2(m) (emphasis added).  A Title VII action need not be based on a single protected trait.  *See Hall v. Kutztown Univ. of Pa. State Sys. of Higher Educ.*, No. 96-4516, 1998 WL 10233, *34 (E.D. Pa. Jan. 12, 1998).  Rather, it "may be

13

based on a combination of impermissible factors." *Id.* at 138 (citing *Fucci v. Graduate Hosp.*, 969 F. Supp. 310, 316 n. 9 (E.D. Pa.1997)).

Similarly, there is more than one way to state a Title VII claim. *See Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008). "A Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the mixed motive theory set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) . . . ." *Makky*, 541 F.3d at 213; *see also Price Waterhouse*, 490 U.S. at 247 n.12 ("Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' case or a 'mixed motives' case from the beginning in the District Court; indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both."); *Sosa v. Napolitano*, 318 Fed. App'x. 68, 72 (3d Cir.  2009) ("[A] plaintiff who has circumstantial evidence of discrimination may choose to proceed under either [theory]."). But at some point, "the District Court must decide whether a particular case involves mixed motives," and "[i]f the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then [he] may prevail only if [he] proves . . . that the employer's stated reason for its decision is pretextual." *Price Waterhouse*, 490 U.S. at 247 n.12.

Here Mr. Kost advances a "mixed motive" theory.  Courts examine "mixed motive" cases under a two-step analysis.  The plaintiff has the initial burden of showing that a protected trait was indeed a  "substantial factor" in the defendant's employment decision. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (citing *Price Waterhouse*, 490 U.S. at 265-66).  The plaintiff can satisfy that burden by "present[ing] sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin

was a motivating factor for any employment practice." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (citation omitted).   Direct evidence is not required; circumstantial evidence can be enough. *Id.*  And if the plaintiff meets his burden, then the defendant must demonstrate, by a preponderance of the evidence, that it would have come to the same decision without considering the protected trait. *Id.*; *Price Waterhouse*, 490 U.S. at 253.

### 1.    Mixed Motive Theory

Though it may be advantageous for a plaintiff to proceed on a "mixed motive" theory, the plaintiff has a high initial hurdle to clear. *See Campetti v. Career Educ. Corp.*, No. 02-1349, 2003 WL 21961438, *7 (E.D. Pa. June 25, 2003).  His evidence "must be so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Id.* (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994)).  For example, workplace comments related to sex sometimes can be enough to raise an inference that sex was a "substantial factor" in an employment decision. *See, e.g.*, *Campetti*, 2003 WL 21961438 at *8 (holding that disputed evidence surrounding a comment that "with women like me around, men like you will never make it in corporate America," and a note making reference to "ruthless women," "crazy broads," and "the only male manager" were sufficient).  On the other hand, stray remarks by a non-decision maker are not enough to support an inference of discrimination. *See, e.g., Hartwell v. Lifetime Doors Inc.*, No. 05-2115, 2006 WL 381685, *10 (E.D. Pa. Feb. 16, 2006) (holding that a co-worker's comments that the plaintiff made black people look bad and referring to him as a "nigger" failed to link racial animus to the defendant's employment decision).  Moreover, favorable treatment towards other employees may not be enough. *See, e.g., Seiple v. Friendly Ice Cream Corp.*, No. 08-4201,  2009 WL 2776609,

at *5-7 (E.D. Pa. Aug. 31, 2009) (holding that evidence that one female employee was treated

favorably did not establish that sex was a motivating factor, particularly where the other

employee was not similarly situated).

To support his "mixed motive" theory, Mr. Kost primarily points to a statement by Ms.

White, who allegedly said:

> I hate the fact that these people are veterans because they have preference.  They're -
> majority of them are white, and they never work out, and I have to get rid of them. . . . I'm
> going to offer them that if they resign, they could get unemployment, and that way, they'll
> have a clear name and nothing negative would happen.

(Kost Dep. at 51.)  If made, Ms. White's statement is enough to show that race was a "substantial

factor" motivating the decision to terminate Mr. Kost.  As in *Campetti*, where the plaintiff was

singled out as "the only male manager," as opposed to his colleagues who were "broads" and

"women," Ms. White's statement shows a desire to "get rid of" "white" employees.  In addition,

Mr. Kost alleges that, when he approached Ms. White about reporting racial and sexual

harassment, Ms. White replied, "You're not going to make a report.  None of this is ever going to

be said."  (Kost Dep. at 92.)  Unlike in *Hartwell*, Ms. White was a decision-maker, whose

alleged comments related to employment actions.  (White Dep. at 21, 68-69; Brooks Dep. at

55-67, 116; Defranco Dep. at 32.)  And because we must construe the facts in Mr. Kost's favor,

Ms. White's alleged statements are enough to shift the burden to DPW.

The evidence adduced could reasonably permit an inference such as would satisfy Mr.

Kost's burden at this stage.  Mr. Burne testified before the Civil Service Commission that white

males "had it more difficult" because less "time was spent with [them], as far as job

training . . . ."  (Burne Test. at 98.)  Mr. Leone testified that:

16

> non white co-workers . . . were given more of the benefit of the doubt, as far as making mistakes as opposed to the Caucasian clerks. . . . Caucasian clerks . . . would get some training on how to do a task and it was like either you pull this off to perfection the very first time it's attempted or we'll knock your block off.  I didn't see that with the African-American workers.  They make a mistake and nothing's said.

(Leone Test. at 75.)  And when Mr. Kost confronted Ms. Brooks about African-American co-workers getting more attention, Ms. Brooks allegedly responded by asking if he was "calling [her] a racist."  (Kost Dep. at 95.)  Mr. Burne, Mr. La Sage, Mr. Branca, and Mr. Kost were all white males, and none received a caseload.  (Burne Test. at 101.)

Mr. Kost asserts other workplace discriminatory comments related, but not limited to his race were made: after Mr. Kost told Ms. Burton that he was going to report her alleged threats to Mr. Burne, she allegedly replied, "Look around you.  Okay.  Who's my boss?  What color is she?  Who's her boss?  What color is she?  Who's her boss? . . . You don't stand a chance. . . . How does it feel to have the shoe on the other foot?"  (Kost Dep. at 91-92.)  Ms. Mosley purportedly made a similar statement: "Look at the situation here. . . . I'm black.  My supervisor's black.  And her supervisor is. . . . Hey, well, you're outnumbered."  (Kost Dep. at 59.)  Finally, Ms. Opaleye-Oluwo supposedly told Mr. Kost not to complain about his work environment: "Look at your skin color. . . . I wouldn't say anything."  (Kost Dep. at 62.)  Ms. Mosley told Mr. Kost in front of others that he would look good as a woman and should consider having a sex change operation.  (Kost Speed Message re: Moseley.)  That statement was corroborated by Ms. Burton (Burton Speed Message), and Ms. Brooks reported it to Ms. White on January 4, 2006 (1/4/06 Brooks Email; Brooks Dep. at 68.)  That same day, Ms. White reported Mr. Kost's intent to file sexual harassment charges to the Director of Human Resources, Ms. DeFranco.  (1/4/06 White Email.)

DPW argues only that Ms. White's statement about "get[ting] rid of" white military veteran employees is not "direct evidence" and therefore cannot support a "mixed motive" theory.  (Def. Reply at 7-8.)  But "direct evidence" is not required.  *See Desert Palace*, 539 U.S. at 101 (citation omitted).  And though DPW argues that Ms. White's reference to white veterans is "unrelated to her frustration" (Def. Reply at 8), that is not clear from her statement.  Finally, though Mr. Branca and Ms. Burton have stated that "Ms. McMahon, Ms. White, and all other supervisory employees [were] at all times . . . fair to all employees, regardless of sex or race," (Branca Decl. ¶ 11; Burton Decl. ¶ 17), Mr. Burne and Mr. Leone disagree.  (Burne Test. at 98; Leone Test. at 75.)  As we must construe the facts in Mr. Kost's favor, Mr. Kost has shown a genuine dispute as to whether race and sex played a "substantial role" in his termination.

With the burden thus shifted, in order to justify summary judgment, DPW must demonstrate by a preponderance of the evidence that it would have withheld permanent employment status to Mr. Kost even if he were not white.  In its version of the facts, DPW claims that "Plaintiff's inability to accept supervision led to his firing."  (Def. Reply at 8.)  Because of his "disruptive behavior" and inability to "accept construction [sic] criticism," Mr. Kost received an overall rating of "Needs Improvement" on his Employee Performance Review for the period between April 18, 2005 and October 14, 2005.  (October 2005 EPR at 5-6).  And Mr. Kost was officially terminated because of "Unsatisfactory Performance," as documented on his EPR for the period between October 14, 2005 and December 28, 2005.  (January 2006 EPR; Termination Letter ¶ 2).  That EPR states in several places that Mr. Kost was "argumentative," "fail[ed] to communicate effectively with [his] supervisor," "demonstrate[d] a reluctance to follow direction," "became so loud that it could be heard by unit members outside of [Ms. White's]

18

door," and "had a very tumultuous relationship with [his] coworkers and supervisor." (January 2006 EPR at 5-6). Ms. Brooks, Ms. White, and Ms. DeFranco all have stated that Mr. Kost was terminated not because of his work performance, but because of his inability to be supervised. (Brooks Decl. ¶ 24; White Dep. at 107; DeFranco Dep. at 31.)

In particular, DPW contends that Mr. Kost reacted negatively to Ms. McMahon's corrections. (McMahon Decl. ¶¶ 6, 8; Branca Decl. ¶ 6.) On one occasion, Mr. Kost was argumentative and shuffled papers loudly in response to Ms. McMahon's instructions on how to improve his narratives, leading to a "corrective conference." (July 2005 McMahon Memo; McMahon Declaration ¶ 10.) On another occasion, Mr. Kost and Ms. McMahon had an argument over whether he would use pen or pencil. (McMahon Declaration ¶¶ 9-10.) Finally, Ms. McMahon explained to Mr. Kost that he would be disciplined if he continued to react to criticism with loud outbursts. (McMahon Decl. ¶ 11.) A second corrective conference was held on August 9, 2005. (*Id.*) Ms. McMahon has stated that Mr. Kost responded by "becom[ing] extremely upset, argumentative, and speak in a loud, aggressive tone." (McMahon Decl. 6.)

A similar pattern of behavior allegedly occurred between Mr. Kost and Ms. Brooks. Ms. Burton stated that "Mr. Kost was frequently insulting and disrespectful to Mrs. Brooks, [who] remained professional and respectful . . . ." (Burton Decl. ¶ 7.) While he was in closed-door meetings with Ms. Brooks, Mr. Kost often spoke so loudly that Ms. Burton could hear him and slammed down papers when he returned. (Burton Decl. ¶¶ 8-9.) In a written statement, Ms. Brooks noted that Mr. Kost "feels he has to challenge every direction given," "often makes simple directions given to him a big ordeal," "raises his voice and demands action," and "often mixes up conversations." (1/4/06 Brooks Email at 5, 7, 9.) Mr. Kost's demeanor apparently

19

made her fear for her safety.  (Brooks Decl. ¶ 12; 1/4/06 Brooks Email at  10-12.)  Mr. Branca, a

white male IMCW, stated that Mr. Kost was "generally a disruptive presence in the office,"and

spoke "so loudly" "in closed-door meetings" that "Mr. Branca] could hear him."  (Branca Decl.

¶¶ 5, 7-8.)

Mr. Kost vigorously disputes DPW's version of the facts.  He notes that many of Ms.

McMahon's alleged concerns were not recorded in his evaluations.  (*Id.*)  He also denies that Ms.

McMahon ever discussed taking corrective action if he continued in his alleged outbursts,

arguing that Ms. McMahon has no formal documentation to support the allegation and pointing

to her contemporary evaluation that his interpersonal relations were satisfactory and that he was

listening to his supervisor.  (*Id.* at  48-49.)  Finally, Mr. Kost denies that he ever did anything that

would make Ms. Brooks concern for her safety.  (*Id.* at  110-114.)  Ultimately, Mr. Kost disputes

any allegations that he was disruptive and unreceptive to supervision, pointing to a lack of

evidence and characterizing those allegations as unsupported fabrications after the fact.

In addition to denying DPW's factual narrative, Mr. Kost has shown circumstantial

evidence that calls it into question.  For example, Mr. Leone worked with Mr. Kost and never

observed any problems between Mr. Kost and his co-workers, and never saw Mr. Kost get angry

or yell.  (Leone Test. at 68.)  In addition, Ms. Opaleye-Oluwo and Mr. Magee have stated that

their interactions with him always were cordial and professional, and that Mr. Kost never caused

them any problems.  (Opaleye-Oluwo Statement; Magee Decl. Statement.)  Finally, Mr. Kost

argues that Ms. White was the ultimate decisionmaker, whose influence permeated every step of

DPW's evaluative process.  He notes that his negative evaluations began when Ms. Brooks

became his supervisor.  (Pl. Opp. to Defs. SOF ¶ 32.)  And because Ms. White supervised Ms.

Brooks, the suggested implication is that Ms. Brooks' and Ms. White's racial animus led to his

negative evaluations.  (Pl. Opp. to Defs. SOF ¶¶ 66-67.)  This evidence undermines DPW's

position that it would have withheld permanent employment status to Mr. Kost even if he were

not white.

When taken in full, the evidentiary record reveals a genuine dispute as to two material

facts:  (1) that race played a "substantial factor" motivating DPW's decision to deny Mr. Kost

permanent employment status; and (2) that DPW would have denied him permanent status even

if Mr. Kost were not white.  Indeed, both parties' "Statements of Undisputed Facts" are filled

with statements that are contradicted and vehemently disputed.  Mr. Kost's Title VII claims

necessarily survive summary judgment.[5]

### 2.    Pretext Theory

Even if Mr. Kost could not prevail on the basis of a mixed-motive analysis, his claims

would still would survive under a pretext analysis.  The "pretext" theory, established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Dep't of Comm.*

*Affairs v. Burdine*, 450 U.S. 248, 253 (1981), "allow[s] plaintiffs to proceed without direct proof

of illegal discrimination where circumstances are such that common sense and social context

suggest that discrimination has occurred."  *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir.

1999); *see also Jakimowicz v. City of Phila.*, 2010 WL 2649890, *3 (E.D. Pa. June 30, 2010)

---

[5]The parties disagree as to whether Mr. Kost has adequately pleaded a sex discrimination claim in addition to his race discrimination claim.  In his opposition brief, Mr. Kost states that his Title VII claims are based on race and sex discrimination; Defendants point out that Mr. Kost's Third Amended Complaint identifies only  "Unlawful Race Discrimination." (Defs. Reply at 6 (quoting 3d Am. Compl. at 8.).  While Mr. Kost appears to consider race and gender as inextricably entwined here, this Court finds that only his race discrimination claim *per se* (tied to gender though it may be) provides grounds to survive the summary judgment phase.

("Under Title VII, claims of discrimination, in the absence of direct evidence of racial discrimination, are guided by the burden shifting framework set forth in *McDonnell Douglas*.").

The Court examines "pretext" cases under a three-step analysis:  (1) the plaintiff must demonstrate by a preponderance of the evidence a *prima facie* case of discrimination; (2) if the plaintiff succeeds, the defendant must demonstrate that it had legitimate, nondiscriminatory reasons for the adverse employment action taken; and, finally, (3) if the defendant succeeds in providing such a reason, the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reasons for said adverse action were not the true reasons.  *McDonnell Douglas*, 411 U.S. at 802-804.  Though the *McDonnell Douglas* test shifts the burden of production between the plaintiff and the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253 (emphasis added).

> a.  *Prima Facie Case*

To establish a *prima facie* case of discrimination, a plaintiff generally must establish by a preponderance of the evidence that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances of his discharge permit an inference of unlawful discrimination.  *See Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  Reverse discrimination suits, however, require a modified analysis.  The plaintiff, given the totality of the circumstances, "must present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."  *Iadimarco*, 190 F.3d at 161.  Common circumstances giving rise to such an inference include the hiring of someone

not in the protected class, or more favorable treatment of similarly situated colleagues.  *See, e.g., Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999).

"The burden of establishing a prima facie case is not onerous."  *Burdine*, 450 U.S. at 253.  The plaintiff simply has to prove by a preponderance of the evidence that he was qualified but rejected "under circumstances which give rise to an inference of unlawful discrimination."  *Id.*  The race of selecting officials is relevant, but it alone is not enough to establish a *prima facie* case.  *See Iadimarco*, 190 F.3d at 156.  In addition, while a plaintiff may make out a *prima facie* case with evidence that similarly situated individuals were treated more favorably, such proof is not required.  *See Morris v. G.E. Fin. Assurance Holdings*, No. 00-3849, 2001 WL 1558039, *5 (E.D. Pa. Dec. 3, 2001) (citation omitted).

Mr. Kost's co-workers at DPW apparently believed that black females were treated more favorably than white males.  For example, Mr. Burne testified before the Civil Service Commission that white males "had it more difficult" because less "time was spent with [them], as far as job training . . . ."  (Burne Test. at 98.)  Mr. Leone testified that "non-white co-workers . . . were given more of the benefit of the doubt, as far as making mistakes as opposed to the Caucasian clerks..."  (Leone Test. at 75.)  Mr. Kost's deposition and declaration are filled with allegations that black females at DPW were treated better than white males.  And Ms. White's alleged statements regarding a need to terminate white military veterans "because they have preference . . . and they never work out, and I have to get rid of them . . ."  indicate a racial motive (Kost Dep. at 51.)  This evidence on the whole is sufficient to overcome Mr. Kost's light burden in demonstrating a case.

23

b.      *Legitimate Interest*

Claiming that Mr. Kost was extremely difficult to supervise, DPW has demonstrated a

legitimate interest in terminating him.  If the plaintiff succeeds in demonstrating a *prima facie*

case, the defendant must demonstrate that it had legitimate, nondiscriminatory reasons for its

employment decisions.  *McDonnell Douglas*, 411 U.S. at 802-804; *Burdine*, 450 U.S. at 253.

The defendant "need not persuade the court that it was actually motivated by the proffered

reasons." *Burdine*, 450 U.S. at 254.  "It is sufficient if the defendant's evidence raises a genuine

issue of fact as to whether it discriminated against the plaintiff." *Id.*  Moreover, the defendant

does not have to demonstrate that all similarly situated employees were treated equally.  *Id.* at

258.  Rather, the plaintiff, when showing a *prima facie* case or pretext, must demonstrate that

they were not.  *Id.*

DPW points to evidence suggesting that Mr. Kost was disruptive and unable to be

supervised.  (Def. Reply at 8.)  Mr. Kost's final EPR stated that Mr. Kost was "argumentative,"

"fail[ed] to communicate effectively with [his] supervisor," "demonstrate[d] a reluctance to

follow direction," "became so loud that it could be heard by unit members outside of [Ms.

White's] door," and "had a very tumultuous relationship with [his] coworkers and supervisor."

(January 2006 EPR at 5-6.)  Mr. Kost's supervisor, and everyone up the chain of command, all

insist that he was terminated because of his inability to be supervised.  (Brooks Decl. ¶ 24; White

Dep. at 107; DeFranco Dep. at 31.)  Some of Mr. Kost's co-workers have corroborated that

account, noting that Mr. Kost was "insulting and disrespectful to Mrs. Brooks," (Burton Decl. ¶

7), and "generally a disruptive presence in the office." (Branca Decl. ¶ 5.)

>            c.        Pretext

While avoiding disruptive employees certainly is a legitimate employer interest, Mr. Kost

has pointed to enough evidence in the record to raise a genuine issue with respect to whether

DPW's stated reason for his termination is pretextual.  If a defendant succeeds in showing a

legitimate interest for the action it has taken against an employee, the plaintiff must demonstrate

by a preponderance of the evidence that the defendant's proffered reasons were not the true

reasons.  *McDonnell Douglas*, 411 U.S. at 802-804.  The plaintiff can either: (1) present evidence

that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that

a factfinder could reasonably conclude that each reason was a fabrication;" or (2) present

evidence that "allows the factfinder to infer that discrimination was more likely than not a

motivating or determinative cause of the adverse employment action."  *Atkinson v. Lafayette

Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) (citation omitted).  If the plaintiff chooses the first

method, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence, and hence infer that the employer did

not act for [the asserted] non-discriminatory reasons."  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d

Cir. 1994) (citation omitted).  If the plaintiff chooses the second method, he has a variety of

options, such as showing that the employer previously discriminated against him or others in his

protected class, or that the employer has treated similarly situated persons not within that class in

a more favorable manner.  *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998).

If a court rejects the employer's articulated reasons, no additional proof of discrimination

is required, but judgment for the plaintiff is not necessarily mandated either.  *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  The plaintiff must convince the factfinder "both that the [articulated] reason was false, and that discrimination was the real reason." *Id.* at 515.

Of course, "a plaintiff may avoid summary judgment by pointing to 'some' evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated (pretextual)." *Fuentes*, 32 F.3d at 764.  "The plaintiff's evidence . . . must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post-hoc fabrication or otherwise did not actually motivate the employment action . . . ." *Id.*  But the plaintiff cannot simply show that the employer's decision was wrong or unwise. *Id.* at 765.  Ultimately, if the plaintiff offers evidence "that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail." *Iadimarco*, 190 F.3d at 166.

In this case, Mr. Kost has demonstrated "such weaknesses . . . in the employer's . . . reasons . . . that a reasonable factfinder could rationally find them unworthy of credence.'" *Fuentes*, 32 F.3d at 765.  Because we must construe the facts in the light most favorable to Mr. Kost and resolve all reasonable inferences in his favor, we cannot give credence to much of DPW's factual account.  Mr. Kost vehemently denies that he was ever disruptive, that any corrective conferences were held, and that he ever yelled, slammed papers, or refused to listen to advice.  (Pl. Opp. to Defs. SOF ¶¶ 38-51, 66, 77-78, 89, 109-24, 134.)

The Court is aware that Mr. Kost's own testimony alone cannot rebut DPW's legitimate reason for terminating him.  (Defs. Reply at 3 (citing *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991).)  However, there is other evidence that corroborates Mr. Kost's story.  For example, several of Mr. Kost's colleagues stated that they worked alongside Mr. Kost

without incident.  (Leone Test. at 68; Opaleye-Oluwo Statement; Magee Statement.).  Finally, because a reasonable jury could conclude, by a preponderance of the evidence, that race was a motivating factor in Mr. Kost's termination, a reasonable factfinder could "infer that the employer did not act for the asserted non-discriminatory reasons in this case." *Fuentes*, 32 F.3d at 765.  If Ms. Brooks and Ms. White were, in fact, substantially motivated by racial animus toward Mr. Kost, then Mr. Kost's subjective evaluations as a "disruptive presence" cannot be credited.

Because genuine issues of material fact remain under either a mixed-motive or pretext analysis, the Court must deny Defendants' motion for summary judgment on Mr. Kost's Title VII claim (Count I).

### B.      DUE PROCESS CLAIM

The Court must grant summary judgment for Defendants Brooks and White on Mr. Kost's Due Process claim (Count II) because Mr. Kost was an at-will employee.  "In any § 1983 action, the court must first make an inquiry [into] whether the alleged conduct was committed by a person acting under color of state law and whether the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Hicks v. Feeney*, 770 F.2d 375, 377 (3d Cir. 1985).  "Our procedural due process analysis involves a two-step inquiry: the first step is to ask whether the complaining party has a protected liberty or property interest within the contemplation of the due process clause of which he has been deprived and, if so, the second question is whether the process afforded to the complaining party to deprive him of that interest comported with Constitutional requirements." *Johnson v.*

*Wenerowicz*, No. 10-5027, 2011 WL 1399809, at *5 (E.D. Pa. April 11, 2011)  (citing *Shoats v.*

*Horn*, 213 F.3d 140, 143 (3d Cir. 2000)); *see also Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000).

Pennsylvania law is clear with respect to who has a property right in his employment.  It

provides that "[a]t any time during the probationary period, the appointing authority may remove

an employee if in the opinion of the appointing authority the probation indicates that such

employee is unable or unwilling to perform the duties satisfactorily or that the employe[e]'s

dependability does not merit continuance in the service."  71 P.S. § 741.603 (2010).  Therefore,

"a probationary status civil service employee, unlike a regular status civil service employee, does

not possess a substantial personal or property right in continued employment."  *Pers. Dep't,*

*Phila. v. Hilliard*, 548 A.2d 354, 356 (Pa. 1988) (citing *Sweeting v. Pa. State Police*, 503 A.2d

1126 (Pa. 1986)).

When he was terminated, Mr. Kost was an at-will employee on probationary status.

Therefore, under Pennsylvania law, he does not have a "personal or property right in continued

employment."  *Hilliard*, 548 A.2d at 356.  Because he has no property right under state law,

summary judgment against his Section 1983 Due Process claim is appropriate.

## C.   CONSPIRACY CLAIM

Relatedly, the Court will grant summary judgment for Defendants Brooks and White on

Mr. Kost's conspiracy claim under Section 1983 (Count II) because Mr. Kost cannot prevail on

his due process claim.  "In order to prevail on a conspiracy claim under § 1983, a plaintiff must

prove that persons acting under color of state law conspired to deprive him of a federally

protected right."  *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999)

(citing *Dennis v. Sparks*, 449 U.S. 24, 29 (1980)). "As a threshold matter, however, a § 1983

conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden*, 423 Fed. App'x 234, 239 (3d Cir. 2011) (citations omitted).

In this case, Mr. Kost has not demonstrated a genuine dispute with respect to whether he was deprived of property without due process. Therefore, Defendants Brooks and White could not have conspired to deprive him of such a right.

## V.    CONCLUSION

Accordingly, Defendants' summary judgment motion will be denied as to Count I and granted as to Count II of the Third Amended Complaint. An appropriate Order follows.